§UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

GILBERTO SUAREZ ,
     Plaintiff,

vs.

MIGUEL ALFREDO GONZALEZ PUEBLA,
NOEL ALAMO, LIDIO M. DOMINGUEZ and
INT. SPORTS MANAGING, LLC, a Florida
Limited Liability Company.
     Defendants.
_____/

CASE NO.:

**<u>Demand for Jury Trial</u>**

## **<u>VERIFIED COMPLAINT PURSUANT TO RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT AND OTHER CAUSES OF ACTION</u>**

Plaintiff, GILBERTO SUAREZ, ("SUAREZ"), by and through his undersigned attorneys, complaining of the Defendants, respectfully allege upon information and belief as follows:

### **<u>INTRODUCTION</u>**

This is an action seeking remedy under the Racketeer Influenced and Corrupt Organizations Act ("R.I.C.O.") for damages suffered by Plaintiff as a result of Defendants', NOEL ALAMO ("ALAMO") and LIDIO M. DOMINGUEZ ("DOMINGUEZ") operation of a criminal enterprise that engages in deliberate violations of INA §274(a)(1)(A)(iv) [8 U.S.C. § 1324(a)(1)(A)(iv)], which makes it a federal crime to encourage or induce an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law.

This Complaint alleges that ALAMO and DOMINGUEZ, in the course of their customary business, operated a criminal enterprise that did frequently and deliberately violate INA § 274(a)(1)(A)(iv) [8 U.S.C. § 1324(a)(1)(A)(iv)] by illegally taking Cuban nationals out of Cuba and bringing them into the United States through the U.S./Mexican border and through

other illegal means. The Defendants have systematically and continuously, over the last ten (10) years, conducted a corrupt enterprise in violation of the Racketeer Influenced and Corrupt Organization ("RICO") Act, which describes "any act which is indictable under the Immigration and Nationality Act, section 274 (relating to bringing in and harboring certain aliens)" as a racketeering activity. 18 U.S.C. § 1961(1)

In addition to the Plaintiff's R.I.C.O. claim, this case also seeks redress for claims for Breach of Contract, Unjust Enrichment, Tortious Interference with a Contractual Relationship, and Tortious Interference with an Advantageous Business Relationship. As grounds therefore, Plaintiff alleges as follows:

## JURISDICTION AND VENUE

1.      The Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1965, which allows for nationwide jurisdiction pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968 and 28 U.S.C. § 1331 (Federal Question Jurisdiction). Plaintiff also invokes the supplemental jurisdiction of this Court with respect to claims based upon the laws of the State of Florida and/or any other applicable jurisdiction pursuant to 28 U.S.C. § 1367.

2.      Venue is proper in Miami-Dade County, Florida because the causes of action accrued in Miami-Dade County. Plaintiff entered into a contract with MIGUEL ALFREDO GONZALEZ PUEBLA ("M.A.G.") in Miami-Dade county, he was supposed to receive payment pursuant to the contract in Miami-Dade county, and ALAMO and DOMINGUEZ live in Miami-Dade county and conducted all of their illegal and fraudulent activities in Miami-Dade county.

3.      The amount in controversy, both individually and collectively, exceeds $75,000.

## PARTIES

4.      Plaintiff, GILBERTO SUAREZ ("SUAREZ"), is a resident of Miami-Dade County, Florida, is over the age of eighteen and is otherwise *sui juris*.

5.      Defendant MIGUEL ALFREDO GONZALEZ PUEBLA ("M.A.G.") is a resident of Florida, is over the age of eighteen and is otherwise *sui juris*.

6.      Defendant NOEL ALAMO ("ALAMO") is a resident of Miami-Dade County, Florida, is over the age of eighteen and is otherwise *sui juris*.

7.      Defendant LIDIO M. DOMINGUEZ ("DOMINGUEZ") is a resident of Miami-Dade County, Florida, is over the age of eighteen and is otherwise *sui juris*.

8.      INT. SPORTS MANAGING, LLC ("ISM") is a Limited Liability Company formed and organized in the state of Florida, owned by ALAMO and DOMINGUEZ, and registered  at 3813 SW 156th Court, Miami, Florida 33185.

## GENERAL ALLEGATIONS

1.      Plaintiff's livelihood is derived from investing in professional baseball players, who are unsigned prospects, prior to their signing contracts with Major League, Minor League, and/or Foreign baseball teams. Plaintiff sponsors the baseball players in order to live comfortably and to train as baseball players in the hopes of obtaining a lucrative contraction to play baseball professionally.

2.      Many of the athletes Plaintiff has sponsored have been from Cuba. If the baseball player is from Cuba, Plaintiff enters into a contract with each athlete after that athlete has left Cuba.

3.      In addition to financially maintaining the athlete in a comfortable manner, Plaintiff sees to it that there is somebody present to guide and mentor him to ensure that he is receiving the proper meals, athletic training, medical treatment and relaxation the athlete requires to be at his best.

Under the terms of the agreement, Plaintiff pays for the athlete's residence, his clothing, his entertainment, his telephone, his computer, security to keep him safe and accompanied, his massages, his medical care, and anything else the athlete desires to maintain his health and happiness. In return the athlete commits himself to providing the Plaintiff with ten percent (10%) of his future contractual earnings once he is signed by a baseball team.

4.      Plaintiff has sponsored several baseball players, including Yasiel Balaguer ("Balaguer"), currently a baseball player in the Chicago Cubs' Minor League club, who was the first player that Plaintiff sponsored in the Dominican Republic.

5.      During Plaintiff's representation of Balaguer, Plaintiff met many sports agents, managers, and players, and earned a reputation as an individual who could sponsor, guide, and protect unsigned and unaffiliated athletes.

6.      Plaintiff's representation of Balaguer led to his successful sponsorship of Carlos Martinez ("Martinez")—currently a pitcher for the St. Louis Cardinals, a Major League Baseball team—and helped him obtain a contract with the Major Leagues.

7.      On the heels of his successes with Balaguer and Martinez, Plaintiff was presented with additional opportunities to sponsor other potential athletes.

8.      In order to sponsor a promising athlete, Plaintiff was occasionally required to borrow funds from third parties, who would later be repaid when the respective athlete signed a professional baseball contract, providing Plaintiff with a return on his investment. One of Plaintiff's third party lenders was a man named Marcos Gonzalez ("Gonzalez"), an attorney from West Palm Beach.

9.      Plaintiff also became acquainted with Jaime Torres ("Torres"), a sports agent whose clients have included Major League Baseball Players like Jose Contreras (of the Boston Red Sox),

Yasiel Puig (of the Los Angeles Dodgers), Alexei Ramírez  of the Chicago White Sox, Gerardo Concepcion (of the Chicago Cubs), Miguel Alfredo Gonzalez (of the Philadelphia Phillies), Dariel Alvarez (of the Baltimore Orioles), Aldemys Diaz (of the St. Louis Cardinals), and a long list of famous Cuban baseball players extending back over three decades.

10.     On or about February 15, 2013, Torres called Plaintiff to inform Plaintiff that he represented a newly-defected Cuban athlete, Miguel Alfredo Gonzalez ( "M.A.G."), who was in El Salvador, and who was in need of a sponsor. Torres provided Plaintiff with M.A.G.'s address and telephone number in El Salvador so that Plaintiff might discuss the possible sponsorship with M.A.G.

11.     Plaintiff spoke with M.A.G. and established the terms of Plaintiff's sponsorship of M.A.G. Plaintiff and M.A.G. agreed that in exchange for Plaintiff's sponsorship of him, M.A.G. would pay Plaintiff ten percent (10%) of his entire future contract when and if M.A.G. signed to play for a baseball team.

12.     Plaintiff obtained the services of Alberto Fariñas, who he paid in order to be with M.A.G., to accompany, guard, and guide M.A.G. pursuant to Plaintiff's instruction. Plaintiff paid Fariñas' room, board, entertainment while Fariñas was with M.A.G., and all travel expenses associated with his employment.

13.     Prior to Fariñas flight to El Salvador to be with M.A.G., Plaintiff went shopping for clothing, sports equipment, and the electronics—including the newest Sumsung Galaxy—that M.A.G. requested and would require during the period of time before signing. That initial shopping expedition cost no less than $8,000.

14.     Fariñas traveled to El Salvador a few days later with all of the merchandise, and he stayed with M.A.G., who accepted everything Plaintiff purchased for him.

15.     On March 5, 2013, M.A.G.'s temporary residency for Mexico was issued, and he traveled to Mexico on March 7, 2013, while Fariñas returned to Miami, intending to join M.A.G. in Mexico a week or two later.

16.     Prior to his travel to Mexico, Plaintiff arranged for M.A.G. to live in a three-bedroom apartment in a secure neighborhood in Mexico City. The apartment, which cost $2,000 a month, had to be rented for a full year due to the unavailability of quality apartments in Mexico City for smaller periods of time.

17.     Once M.A.G. arrived in Mexico, Plaintiff and M.A.G. reaffirmed the terms of their agreement by phone.

18.     On or about May or June, 2013, ALAMO approached Plaintiff when Plaintiff was at a friend's, Raul Pacheco ("Pacheco"), house and told him that Marcos Gonzalez had sent him to see Plaintiff. He stated that Marcos Gonzalez owed him and his partner, DOMINGUEZ, $200,000.00, a debt which Marcos Gonzalez had instructed them to collect from Plaintiff because Plaintiff owed Marcos a similar amount of money from a previous loan that Marcos had extended to Plaintiff.

19.     ALAMO introduced himself as Nosly, which was the nickname of a known human smuggler, who had taken baseball player Jorge Carlos Soler Castillo out of Cuba to Haiti on a speedboat in 2011. Pacheco confirmed that ALAMO was the human smuggler who had taken Jorge Carlos Soler Castillo out of Cuba.

20.     Plaintiff later learned that ALAMO and DOMINGUEZ owned a business, ISM, that they used to allegedly sponsor promising Cuban athletes before they were signed by professional baseball teams. ALAMO and DOMINGUEZ considered their business a full-service enterprise for their athletes, providing the athletes with residencies in third countries, and human smuggling

services for them and their families when such service was requested. *See* "**Exhibit A**", an affidavit by Alberto Fariñas, who was well acquainted with ALAMO.

21.      Plaintiff learned from Fariñas that, aside from Jorge Carlos Soler Castillo, ALAMO and DOMINGUEZ were also responsible for smuggling baseball player Rusney Castillo out of Cuba via speedboat in 2013, and that they made six to eight million dollars ($6,000,000.00 to $8,000,000.00) out of that deal. Refer to Exhibit A.

22.      Plaintiff learned from Fariñas that ALAMO and DOMINGUEZ not only took Jorge Carlos Soler Castillo, right fielder for the Chicago Cubs, out of Cuba to Haiti on a speedboat in 2011, but that they paid a $40,000 or $50,000 bribe to obtain Soler Castillo's Haitian residency. ALAMO and DOMINGUEZ also took Jorge Rivero, pitcher in the Chicago Cub's triple A minor leagues team, out of Cuba in 2011 or 2012 and paid approximately $40,000 for Rivero's Haitian Residency. ALAMO and DOMINGUEZ took Rusney Castillo out of Cuba in 2013 by speedboat out of Oriente, Cuba, and brought him to Haiti, where they paid a $60,000 bribe to obtain Castillo's Haitian residency. *Refer* to Exhibit A.

23.      Along with the baseball players, ALAMO and DOMINGUEZ would also smuggle into the United States—through the U.S./Mexico border—the players' families and loved ones; sometimes this additional smuggling of family and loved ones represented an additional fee that the baseball player would have to pay to ALAMO and DOMINGUEZ after having obtained a professional baseball contract. ALAMO said that they smuggled Soler Castillo's father, also named Jorge Soler, out of Cuba and smuggled him into the United States through the U.S./Mexico border in 2011 or 2012. ALAMO later told Fariñas that they also brought Rusney Castillo's girlfriend, nicknamed "la Chacala", into the United States through Mexico via the U.S./Mexico border in 2013. *Refer* to Exhibit A.

24.     ALAMO and DOMINGUEZ have made a business out of smuggling Cuban baseball players and their families and loved ones out of the country, and bringing them into the United States by whatever means necessary in direct violation of INA (a)(1)(A)(iv) [8 U.S.C. § 1324(a)(1)(A)(iv)], which is punishable by imprisonment of not less than five (5) years pursuant to INA§ 274 (a)(2)(B)(ii) [8 U.S.C. § 1324(a)(2)(B)(ii)].

25.     ISM, a business formed and maintained in the state of Florida that is regularly engaged in and whose activities affect interstate and foreign commerce, is the public face of ALAMO and DOMINGUEZ's athlete sponsorship enterprise, the entity that pays for all of the athletes financial needs before they are signed by a professional sports team, and the entity that officially receives payment from the athletes after they are signed.

26.     ALAMO and DOMINGUEZ conducted their enterprise through both legal and illegal transactions. The legal transactions include the purchasing of good and equipment that have moved in the course of interstate or foreign commerce for the athletes that they are representing through Int. Sport Managing, LLC., the sending of money for living expenses to foreign countries for those athletes and the cost of transportation for those athletes. The illegal transactions include the bribing of foreign officials in order to obtain residency for the athletes in other third countries, the illegal smuggling of the Cuban nationals via speedboat from Cuba with the intent of bringing them to the United States, and the smuggling of Cuban nationals into the United States via Mexico. *Refer* to Exhibit A.

27.     ALAMO and DOMINGUEZ continue to operate ISM, and Plaintiff believes that they continue to smuggle athletes and their families out of Cuba for the United States.

28.     When ALAMO approached Plaintiff at Pacheco's home, claiming that Plaintiff owed Marcos Gonzalez money, Plaintiff denied the debt and sent him on his way.

29.     The following morning, Plaintiff called Marcos Gonzalez to verify ALAMO's claims of discharging Plaintiff's alleged debt to Marcos. When Marcos verified ALAMO's story, Plaintiff called Pacheco, who was ALAMO's friend, and asked him if he could set up a meeting with ALAMO. Pacheco was able to successfully set up that meeting, and later that same day, at 3:00pm, Plaintiff met up with ALAMO and DOMINGUEZ at a restaurant called Cancun Grill, located in Miami Lakes.

30.     Plaintiff informed ALAMO and DOMINGUEZ that he was unable to repay Gonzalez's loan at the moment because he had invested all of Plaintiff's money in M.A.G.'s sponsorship. What Plaintiff offered them, instead of money, was a three (3%) interest in M.A.G.'s contract, which would be taken from Suarez's ten percent (10%) overall interest in same. They accepted those terms and they ended their meeting.

31.     Unbeknownst to Plaintiff at that time, ALAMO and DOMINGUEZ were the sole owners of ISM, located at 3813 SW 156th Court, Miami, Florida 33185, a residential home owned by DOMINGUEZ. ALAMO and DOMINGUEZ represented Cuban Baseball Players, and were reputed to also smuggle them out of Cuba.

32.     Unbeknownst to Plaintiff at the time, ALAMO and DOMINGUEZ had previously financed a failed smuggling attempt of M.A.G. from Cuba.

33.     On Plaintiff's information or belief, ALAMO and DOMINGUEZ conspired to take Plaintiff's share of M.A.G. future contract away from Plaintiff upon learning of Plaintiff's sponsorship of M.A.G.

34.     On or about May 2013, the day following their meeting at Cancun Grill, ALAMO called Plaintiff to state that he had a better solution to the $200,000.00 debt that was owed by Plaintiff to Marcos Gonzalez, who in turn owed ALAMO and DOMINGUEZ the same amount.

ALAMO asked Plaintiff to meet with him and a third person, Mario Marrero ("Marrero") at Marrero's office. Agreeing to meet with them, Plaintiff picked up Fariñas at his home so that Fariñas could act as a witness to the meeting, and met with ALAMO and Marrero. During that meeting, ALAMO stated that Marrero was willing to immediately pay ALAMO and DOMINGUEZ the $200,000.00 owed to them by Gonzalez—and by extension, Plaintiff—if he were given a three percent (3%) interest in M.A.G.'s future baseball contract.

35.     Plaintiff agreed to provide Marrero with thirty percent (30%) of Plaintiff's ten percent (10%) total interest in M.A.G.'s future contract (for a total of a three percent (3%) interest in M.A.G.'s overall contract) if he paid ALAMO and DOMINGUEZ $200,000.00 immediately, thereby discharging Plaintiff's $200,000.

36.     Before he provided ALAMO and DOMINGUEZ with the $200,000.00, Marrero wanted to secure his three percent (3%) interest in M.A.G.'s future contract by getting the agreement in writing with M.A.G. It was agreed that Fariñas, ALAMO, and Marrero would travel together to Tijuana, Mexico, where M.A.G. was participating in tryouts, so that ALAMO and Marrero could obtain the contract, and Fariñas could remain with M.A.G. The trip was planned and the plane tickets to fly to see M.A.G. were purchased during the initial meeting with Marrero.

37.     After the meeting, on the way back to Fariñas house, Plaintiff called M.A.G. on speaker phone so that Plaintiff, Fariñas and M.A.G. could all participate in the conversation. Plaintiff told M.A.G. that Fariñas would be going to Mexico with two other men that M.A.G. did not know, and that M.A.G. would need to sign over a contract, granting one of those men a three percent (3%) interest in M.A.G.'s future contract. M.A.G. said that his agreement with Plaintiff was for ten percent (10%) and that he was not going to give somebody else an additional three percent (3%). Plaintiff explained to M.A.G. that the three percent (3%) interest would be derived from

Plaintiff's ten percent (10%), leaving Plaintiff with a seven percent (7%) interest. M.A.G. agreed to sign over to Marrero a three percent (3%) interest in his future contract, telling Plaintiff that Plaintiff had a ten percent (10%) interest in his contract, and that Plaintiff could dispose of that 10% in any way Plaintiff chose. He specifically stated: "You have a ten percent (10%) interest in my contract, if you want me to sign ten (10) different contracts with a one percent (1%) interest each, I'll sign ten different contracts."

38.     Fariñas, ALAMO, and Marrero, traveled to Mexico and visited M.A.G. at the hotel that Plaintiff was paying for him to stay during the tryouts. When Fariñas, ALAMO and Marrero arrived, M.A.G. called Plaintiff to tell Plaintiff about their arrival. Plaintiff gave him leave to sign the contract giving Marrero a three percent (3%) interest in M.A.G.'s future contract.

39.     ALAMO and Marrero obtained M.A.G.'s signature and left, but not before they had inserted a seed of betrayal in M.A.G.'s heart, by offering to bring M.A.G.'s girlfriend into the United States, something that Plaintiff had flatly refused to do when M.A.G asked Plaintiff to perform that service.

40.     Fariñas remained in Tijuana, Mexico for approximately two weeks until the tryouts were over, and then Fariñas returned to Miami, while M.A.G. returned to Mexico City.

41.     After the trip, ALAMO stayed in contact with Fariñas, visiting at his home every day, sometimes for hours at a time. It was during this time that ALAMO turned Fariñas against Plaintiff by telling Farinas that Plaintiff was using him and abusing him by not recompensing him appropriately for his services to M.A.G. He said that Plaintiff was a relatively rich man compared to Fariñas, and that Plaintiff was just being greedy by not giving Fariñas a share of the profits. M.A.G.'s contract was expected to be a record-breaking amount of money based on his past performance and on his status as a Cuban baseball star. When Fariñas said that Fariñas did not have

the money to sponsor M.A.G. or any athlete on his own, ALAMO told Fariñas that ALAMO and DOMINGUEZ's business, ISM, would pay for M.A.G.'s costs during the remainder of the time before he signed a contract—an event which by that point in time was imminent—and then Int. Sports Managing could collect the remaining seven percent (7%) interest due to Suarez, and provide Fariñas with a percentage of the proceeds. Fariñas eventually agreed to betray Plaintiff and take what he believed would be a share of what was expected to be a record-breaking contract, minus ISM's costs in sponsoring M.A.G. Plaintiff was to be completely cut off from any profit. *Refer* to "Exhibit A".

42.     ALAMO told Fariñas that they would be able to win M.A.G. if they agreed to smuggle M.A.G.'s girlfriend, Gretel Gonzalez, into the United States. *Refer* to Exhibit A

43.     During the following weeks both ALAMO and Fariñas engaged on a concerted campaign of badmouthing Plaintiff to M.A.G., eventually ensuring M.A.G.'s bad faith toward the Plaintiff.   But it was not until ALAMO guaranteed M.A.G. that they would take M.A.G.'s girlfriend, Gretel Gonzalez, out of Cuba and smuggle her into the United States through Mexico— something that Plaintiff had refused to do when M.A.G. had asked Plaintiff about it—that M.A.G. agreed to abandon Suarez for ALAMO and DOMINGUEZ.   After the well was successfully poisoned, M.A.G. refused to speak to Plaintiff directly and spoke only to Fariñas and to ALAMO. *Refer* to Exhibit A.

44.     ALAMO and DOMINGUEZ did take M.A.G.'s girlfriend, Gretel Gonzalez, out of Cuba and smuggled her into the United States through the Mexico/United States border on or about August 2013.

45.     During the remaining months, Plaintiff continued to pay for all of M.A.G.'s expenses, which included $2,000 a month of the apartment, which had to be purchased in advance

for one (1) year,  $3,260 a month for car rental, approximately $4,000 a month for food, $2,000 a month in spending money for M.A.G., $3,000 salary for Fariñas (aside from his room and board), as well as all medical expenses and all expenses related to his training and outside entertainment. Plaintiff spent no less than $200,000.00 on M.A.G.'s sponsorship during that time.

46.     When the Philadelphia Phillies did offer for him, it appeared as if it would be a more than $50 million contract, however problems with M.A.G.'s pitching elbow revealed by an MRI, reduced the contract to a three-year $12 million contract, which he signed at the end of August, 2013.

47.     Unbeknownst to Plaintiff at that time, M.A.G. had come to Miami in August, 2013 and remained in a hotel here for a couple of weeks. He specifically asked Fariñas not to mention it to Plaintiff. During that time, M.A.G. signed a contract with ISM, assigning that entity a seven percent (7%) interest in M.A.G.'s contract. It was M.A.G.'s intention to pay ALAMO and DOMINGUEZ the seven percent (7%) share that was due to Plaintiff. Refer to Exhibit A

48.     M.A.G. was supposed to pay Plaintiff his first installment payment after he received his first check.

49.     M.A.G. received his first installment payment of $1,448,111.09 from the Philadelphia Phillies on September 30, 2013.

50.     Plaintiff knew, through Fariñas, as well as through newspapers and the internet, that M.A.G. had signed a $12,000,000 contract, and that M.A.G. would soon receive a portion of that payment, which he would then use to pay Plaintiff a portion of Plaintiff's seven percent (7%) interest in his contract. When no payment was forthcoming, Plaintiff called M.A.G. to ask him about it, but the athlete refused to pick up the phone.

51.     Fariñas told Plaintiff that while M.A.G. did not want to have direct contact with Plaintiff, Fariñas was in continual communication with M.A.G., who Fariñas said had asked for Plaintiff to forego receiving payment immediately after the first installment because he needed to close on a home, and purchase a car and other necessities. Fariñas told Plaintiff that he told M.A.G. that Plaintiff would be willing to wait until he received his second payment before he began paying Plaintiff the remaining seven percent (7%) interest in his contract. Plaintiff accepted the change, and expected to be paid at the next installment.

52.     Shortly thereafter, M.A.G. stopped accepting Fariñas calls, and ALAMO told Fariñas that M.A.G. no longer wanted to speak with him directly, but that Fariñas would receive payment as soon as M.A.G. sent the money. *Refer* to Exhibit A.

53.     Meanwhile M.A.G. paid out to ALAMO, DOMINGUEZ, and ISM the entire seven percent (7%) interest in his contract, approximately $840,000, which was due to Plaintiff.

54.     M.A.G. drew up checks and wired money to ALAMO directly and to ISM, which is ALAMO and DOMINGUEZ's wholly owned company.

55.     ALAMO, DOMINGUEZ, and ISM did nothing to earn or acquire Plaintiff's seven percent (7%) interest in M.A.G.'s contract, but only benefitted by means of fraud, deceit and theft from Plaintiff's investment and sacrifice.

56.     Fariñas did not receive any payment from M.A.G. *Refer* to Exhibit A.

57.     Plaintiff was still waiting on payment from M.A.G. on or about September, 2014, when Farinas confessed everything to Plaintiff regarding how M.A.G. had been stolen from Plaintiff by ALAMO and DOMINGUEZ.

58.     M.A.G., poisoned against Plaintiff by the lies he was told by ALAMO, and seduced by ALAMO's promise to bring M.A.G.'s girlfriend to the United States, knowingly and

intentionally paid ALAMO and DOMINGUEZ the money that they all knew was due to Plaintiff based on Plaintiff's contractual agreement with M.A.G., acknowledged to United States Federal Agents his debt to Plaintiff, and he falsely asserted to the agents that he had paid Plaintiff $1 million pursuant to that contract. *See* "**Exhibit B**", M.A.G.'s statement to U.S. Department Homeland Security Investigation Agents and Davie Police Department Detectives.

59.     The Immigration and Customs Enforcement Investigation into M.A.G. yielded the bank account records of M.A.G., which demonstrate that M.A.G. paid ALAMO and DOMINGUEZ a total of $778,754.00. M.A.G wired to ISM a total of $600,000 between October 4, 2013 and February 19, 2014; he sent six (6) checks totaling $ 178,754.00 made out to Noel ALAMO Vasallo between October 29, 2013 and February 2, 2014. *See* "**Exhibit C**"

60.     Plaintiff has retained the law offices of the undersigned attorney to represent him in this action and are obligated to pay a reasonable attorney's fee.

### COUNT 1
### CIVIL R.I.C.O.
### (ALAMO and DOMINGUEZ)

Plaintiff adopts by reference, as if set out fully and completely in this Count, the following statements of this Complaint: Paragraphs 1 through 60.

61.     ALAMO and DOMINGUEZ are direct co-participants in the conduct of an enterprise, the activities of which affect interstate and foreign commerce.

62.     The Defendants have engaged, and continue to engage, in an open and ongoing pattern of violations of 8 U.S.C. § 1324 during at least the last five years through their administration of ISM, which they use in both legal and illegal ways.

63.     ALAMO and DOMINGUEZ engaged and continue to engage in a pattern of racketeering activity in the form of Human Smuggling, which is prohibited under INA

§274(a)(1)(A)(iv) [8 U.S.C. §1324(a)(1)(A)(iv) and punishable under INA §274(a)(2)(B)(ii). Some of their past exploits include the following:

    a.   In 2011, Defendants, working with professional smugglers, brought Jorge Carlos Soler Castillo, , right fielder for the Chicago Cubs, and his father, Jorge Soler, out of Cuba using a speedboat. They took Soler Castillo to Haiti, where Defendants paid a $40,000 to $50,000 bribe to obtain Soler Castillo's Haitian residency before signing with a professional baseball team and coming to the United States. Jorge Soler, Soler Castillo's father, was brought to the United States by the Defendants via the U.S./Mexico border. Soler Castillo's intended ultimate destination was always the United States.

    b.   In 2011 or 2012, Defendants, working with professional smugglers, brought Jorge Rivero, pitcher of the Chicago Cuba's triple A minor leagues team, out of Cuba using a speedboat. They took Rivero to Haiti, where Defendants paid a $40,000 bribe to obtain Rivero's residency before signing with a professional baseball team and coming to the United States. Rivero's intended ultimate destination was always the United States.

    c.   In 2013, Defendants, working with professional smugglers, brought Rusney Castillo out of Cuba using a speedboat. They took Castillo to Haiti, where Defendants paid a $60,000 bribe to obtain Castillo's Haitian residency before signing with a professional baseball team and coming to the United States. Castillo's intended ultimate destination was always the United States.

d.  Along with the baseball players, ALAMO and DOMINGUEZ would also smuggle into the United States—through the U.S./Mexico border—the players' families and loved ones; sometimes this additional smuggling of family and loved ones represented an additional fee that the baseball player would have to pay to ALAMO and DOMINGUEZ after having obtained a professional baseball contract. ALAMO said that they smuggled Soler Castillo's father, also named Jorge Soler, out of Cuba and smuggled him into the United States through the U.S./Mexico border in 2011 or 2012. ALAMO later told Fariñas that they also brought Rusney Castillo's girlfriend, nicknamed "la Chacala", into the United States through Mexico via the U.S./Mexico border in 2013.

e.  In August 2013 ALAMO and DOMINGUEZ smuggled Gretel Gonzalez out of Cuba and into the United States through the U.S./Mexico border.

64.  R.I.C.O. prohibits a person from investing in an enterprise any income derived from a pattern of racketeering activity [§1962(a)], prohibits a person from using a pattern of racketeering activity, or the collection of an unlawful debt, to acquire or maintain control over an enterprise [§1962(b)], prohibits a person from conducting the affairs of an enterprise through a pattern of racketeering, or the collection of an unlawful debt [§1962(c)], and prohibits a person from conspiring to violate Sections 1962(a), (b), or (c) [§1962(d)].    R.I.C.O. defines "racketeering activity" as "any act which is indictable under the Immigration and Nationality Act, section 274 (relating to bringing in and harboring certain aliens)". 18 U.S.C. § 1961(1).

65.  INA § 274(a)(1)(A)(iv) prohibits any person from encouraging or inducing "an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law".

66.     Between 2011 to 2013, Defendants have smuggled or attempted to smuggle into the United States no fewer than five (5) Cuban Nationals, including Jorge Carlos Soler Castillo, Jorge Soler (Soler Castillo's father), Gretel Gonzalez (M.A.G.'s ex-girlfriend), Rusney Castillo, and "la Chacala" (Rusney Castillo's girlfriend).

67.     Plaintiff was directly injured in his business as by reason of Defendants' illegal racketeering activity. Specifically, Defendants took Plaintiff's contractually-bound baseball prospect, M.A.G., away from Plaintiff—and appropriated for themselves the seven percent (7%) interest in M.A.G.'s professional baseball contract due to Plaintiff—by promising M.A.G. to smuggle Gretel Gonzalez, M.A.G.'s girlfriend at that time into the United States via Mexico.

68.     Defendants, believing that M.A.G. would obtain a record-setting contract with a major league team, coveted Plaintiff's contract with the player, and they set out to interfere with that contract, to sever that business relationship between M.A.G and Plaintiff and to obtain for themselves the profit from M.A.G.'s future contract by means of their racketeering activity—i.e. by smuggling into the country M.A.G.'s girlfriend, Gretel Gonzalez, in contravention to INA §274(a)(1)(A)(iv) [8 U.S.C. 1324(a)(1)(A)(iv)].

WHEREFORE, Plaintiff respectfully requests that this honorable court award him $2,520,000.00, which is equal to threefold the damages he sustained, award him the cost of the suit, including reasonable attorney's fee, and award him any other relief this court deems just and appropriate.

## COUNT 2
## BREACH OF CONTRACT
### (M.A.G.)

Plaintiff adopts by reference, as if set out fully and completely in this Count, the following

statements of this Complaint: Paragraphs 1 through 68.

69.     Plaintiff and M.A.G. entered into an agreement.

70.     The terms of the agreement stated that in exchange for financial sponsorship of M.A.G., M.A.G. would give Plaintiff a ten percent (10%) interest in M.A.G.'s future contract to play baseball.

71.     Plaintiff and M.A.G., by mutual agreement, reduced Plaintiff's interest in M.A.G.'s future baseball contract to seven percent (7%).

72.     Plaintiff provided M.A.G. with the contracted financial support.

73.     M.A.G. failed to pay Plaintiff the seven percent (7%) interest Plaintiff had in M.A.G.'s twelve million dollar ($12,000,000) contract with the Philadelphia Phillies. Instead, M.A.G. purposely paid ALAMO and DOMINGUEZ the money that was due Plaintiff.

74.     M.A.G. breached his contract with Plaintiff when he failed to pay Plaintiff in accordance to their contract.

75.     Plaintiff has suffered damaged from the breach; he has lost his investment payment in M.A.G. of approximately $200,000, which is what it cost him to maintain the athlete before he signed with the Phillies, did not receive any return on his investment, and has been forced to hire the undersigned attorney to collect on the contract.

WHEREFORE, Plaintiff hereby demands Judgment against M.A.G. for damages and breach of contract, plus pre-judgment interest, cost associated with this action, attorney's fees, together with such other, further and different relief as the Court may deem just and proper.

## COUNT 3
## UNJUST ENRICHMENT
### (M.A.G.)

Plaintiff adopts by reference, as if set out fully and completely in this Count, the following statements of this Complaint: Paragraphs 1 through 75.

76.     Plaintiff has conferred a benefit in the form of gifts and financial sponsorship in excess of $200,000 on the M.A.G., who has knowledge thereof.

77.     M.A.G. voluntarily accepted and retained the benefit conferred, which enabled him to train, and to obtain a twelve million dollar ($12,000,000) baseball contract with the Philadelphia Phillies.

78.     The circumstances render M.A.G.'s retention of the benefit inequitable unless the M.A.G. pays to Plaintiff the value of the benefit.

79.     M.A.G. has been unjustly enriched at the expense of Plaintiff.

80.     Plaintiff is entitled to damages as a result of M.A.G.'s unjust enrichment, including the disgorgement of all monies unjustly accepted by M.A.G. from Plaintiff.

WHEREFORE, Plaintiff demands monetary damages against M.A.G. for unjust enrichment and such other relief this Court deems just and proper.

## COUNT 4
## UNJUST ENRICHMENT
### (ALAMO, DOMINGUEZ and ISM)

Plaintiff adopts by reference, as if set out fully and completely in this Count, the following statements of this Complaint: Paragraphs 1 through 80.

81.     Plaintiff has conferred a benefit on ALAMO, DOMINGUEZ and ISM, who have knowledge thereof.

82.    Defendants voluntarily accepted and retained the benefit conferred.

83.    The circumstances render Defendants' retention of the benefit inequitable unless the Defendants pay to Plaintiff the value of the benefit.

84.    Defendants have been unjustly enriched at the expense of Plaintiff

85.    Plaintiff is entitled to damages as a result of Defendants' unjust enrichment, including the disgorgement of all monies unjustly accepted by Defendant from M.A.G.

WHEREFORE, Plaintiff demands monetary damages against Defendant for unjust enrichment and such other relief this Court deems just and proper.

## COUNT 5
## TORTIOUS INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP
## (ALAMO, DOMINGUEZ and ISM)

Plaintiff adopts by reference, as if set out fully and completely in this Count, the following statements of this Complaint: Paragraphs 1 through 85.

86.    A valid contract existed between Plaintiff and M.A.G., whereby Plaintiff would collect ten percent (10%)—later reduced to seven percent (7%)—of M.A.G.'s contract with a professional baseball team in exchange for his financial support.

87.    Defendants knew about the contract because Plaintiff himself told ALAMO and DOMINGUEZ about the contract during their meeting at Cancun Grill.

88.    Defendants conspired and immediately took actions—described within the body of the complaint—intended to induce a disruption of the contract and in induce M.A.G. to breach his obligation to pay Plaintiff:

a.   ALAMO, DOMINGUEZ and ISM sabotaged Plaintiff's employee/agent, Alberto Fariñas, who was the main contact with M.A.G. and, through the use of fraud, convinced him to help them steal M.A.G. away from Plaintiff.

b.   ALAMO, DOMINGUEZ and ISM maligned Plaintiff to M.A.G.

c.   ALAMO, DOMINGUEZ and ISM secured M.A.G.'s loyalty to them by agreeing to smuggle M.A.G.'s girlfriend, Gretel Gonzalez, out of Cuba and into the United States via Mexico, which they did on or about August, 2013.

d.   ALAMO, DOMINGUEZ and ISM then collected from M.A.G. all of the money that was due to Plaintiff.

89.   ALAMO, DOMINGUEZ and ISM had no legal justification for their actions.

90.   As a result of Defendants' deliberate and intentional interference with Plaintiff's contract with M.A.G., M.A.G. breached his contract, causing Plaintiff damages, first in the loss of his expected gain, and then in the loss of the money he had already invested.

WHEREFORE, Plaintiff demands monetary damages against Defendants to include the amount he would have received but for Defendant's tortuous interference with the contractual relationship and such other relief this Court deems just and proper.

## COUNT 6
## TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIP
### (ALAMO, DOMINGUEZ and ISM)

Plaintiff adopts by reference, as if set out fully and completely in this Count, the following statements of this Complaint: Paragraphs 1 through 90.

91.   There was a business relationship between Plaintiff and M.A.G.

92.     Defendants had knowledge of that relationship because Plaintiff himself told them about it during their meeting at Cancun Grill.

93.     Using the means already described in the body of the Complaint, Defendants deliberately interjected themselves into the relationship between Plaintiff and M.A.G. with the intention of rending that relationship asunder and collecting the benefits of Plaintiff's relationship with M.A.G..

94.     Due to Defendants' interference, M.A.G. refused to continue dealing with Plaintiff directly, and then ultimately cut off all ties to the Plaintiff, and provided Defendants with the benefit of M.A.G.'s business, and causing Plaintiff damages, first in the loss of his expected gain, and then in the loss of the money he had already invested.

WHEREFORE, Plaintiff demands compensatory damages in the amount of $840,000.00, plus pre-judgment interest, cost associated with recovery of Plaintiff's property, attorney's fees, together with such other, further and different relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury of all issues so triable herein.


Respectfully submitted by:_s/Kenia Bravo_____
Kenia Bravo, Esq., Fla Bar No. 68296
Avelino J. Gonzalez, Esq., Fla Bar No. 75530
Law Offices of Avelino J. Gonzalez, P.A.
6780 Coral Way, Miami, Florida 33155
Ph: 305-261-4000 Fax: 305-668-3545
Attorneys for Plaintiff

## Verification

I, Gilberto Suarez, declare as follows:

1.      I am the Plaintiff in the present case, a citizen of the United States of America, and a resident of the State of Florida.

2.      I have personal knowledge of myself, my activites, and my intentions, including those set out in the foregoing *Verified Complaint Pursuant to Racketeer Influenced and Corrupt Organizations Act and Other Causes of Action*, and if called on to testify I would competently testify as to the matters stated herein.

3.      I have personal knowledge of the contract between myself and Miguel Alfredo Gonzalez Puebla ("M.A.G."), and all of the acts that took place in compliance of same, as well as of Miguel Alfredo's actions in breaching the contract.

4.      I have personal knowledge of my agreement with Noel Alamo and Lidio M. Dominguez in regard to the $200,000 debt and how that debt would be satisfied by Mario Marrero in exchange for a percentage of M.A.G.'s future contract with a professional baseball team.

5.      I have personal knowledge of Alamo's reputation as a Human Smuggler, and how that smuggling activity caused my damages.

6.      I have knowledge of Alamo and Dominguez's smuggling activities, which I learned through their one-time co-conspirator, Alberto Fariñas.

7.      If called on to testify as to the facts alleged in the *Verified Complaint Pursuant to Racketeer Influenced and Corrupt Organizations Act and Other Causes of Action*, I would competently testify as to the matters stated herein.

8.      I verify under penalty of perjury under the laws of the United States of America that the factual statements in the Complaint concerning myself, my activites, and my intentions are true and correct, as are the factual statements concerning M.A.G., Alamo, Dominguez, their activities, and their intentions. 28 U.S.C. § 1746.

Executed on ____1/19____, 2016

GILBERTO SUÁREZ